HARRIS, Presiding Judge.
Appellant was indicted for murder in the first degree involving the rifle slaying of the man with whom she had been living for several years. The shooting occurred on December 18, 1976, outside the home of appellant. She was convicted of murder in the second degree and the jury fixed her punishment at twenty years in the penitentiary. She was represented by counsel of her choice and at arraignment pleaded not guilty. Her retained counsel represents her on this appeal.
The evidence was in hopeless conflict and only a jury could unscramble the confused state of the evidence and arrive at a verdict. The evidence for the State made out a case of homicide against appellant but appellant denied that she fired the fatal shot and further denied that she was present when the deceased was shot. She claimed she was at her daughter’s house about seventy-five yards away when she learned the deceased had been shot.
*163 Officer William Edward Traylor testified that he was an investigator with the Alabama Bureau of Investigation and that on the night of December 18, 1976, he was dispatched to 108 Gray Road in Heflin, Cle-burne County, Alabama, to investigate a shooting at this address. When he arrived he found the victim, James C. Johnson, had been carried by ambulance to a local hospital. He made a careful inspection of the premises and made numerous photographs depicting blood throughout the house. The photographs were introduced into evidence by appellant’s counsel. Traylor also found a .22 rifle on the front porch of appellant’s house. On a table in the back yard he found a 12 gauge bolt action shotgun. This gun had been on the table for some time as he observed spider webs leading from the barrel of the gun to the table and it was his opinion this shotgun had not been fired lately.
He further testified that he found cartridges for a .22 caliber weapon in one of the bedrooms of the house and also in the living room. This officer personally knew the deceased and made photographs of him which were used to identify the victim to the Toxicologist who conducted a postmortem examination on the body of the victim. These photographs were made of the deceased at the Cleburne County Hospital on the night he was shot.
This officer sent the .22 caliber rifle, cartridges, and the shotgun to the State Laboratory in Jacksonville to the Director, John M. Case, for examination.
The Toxicologist, Carlos Rabren, whose qualifications were admitted by the defense, testified that he performed a postmortem on a black male on Monday, December 20, 1976, in the autopsy room in the Auburn Laboratory. He was shown photographs of the deceased and identified them as the black male on whom he performed the postmortem. This examination was performed in the presence of the Coroner of Cleburne County and another employee of the Laboratory. He said that during the course of the autopsy he recovered a small caliber projectile which had severed the left pudendal vein, “which is a very large vessel.” He stated his opinion as to the cause of death in these words: “In my opinion, death in this case resulted from massive hemorrhage, associated with a bullet wound which severed the left pudendal vein.”
Mr. John M. Case, a Criminalist with the Alabama Department of Toxicology, whose qualifications as a ballistics expert were admitted, testified that he received from Officer Gwin McKleroy a Mossburg 12 gauge bolt action shotgun and a Winchester Model 67, .22 caliber rifle. He was requested to examine the weapons to determine if the bullets from either weapon matched a bullet removed from the body of the deceased. He test-fired the weapons and compared the test bullets from the .22 caliber rifle with the bullet identified from the body, “and in my opinion the bullet from the body was fired from this rifle.”
Mr. Case further stated that he examined the shotgun for blood stains and failed to find any blood stains on the shotgun. He said a live round was submitted with the shotgun, but it was not inside the weapon.
On cross-examination Mr. Case testified that when he received the weapons, cartridges, and shell from Officer McKleroy he also received a sealed vial of blood labeled with the name of the deceased. He ran a laboratory test on this blood sample and it showed the presence of ethyl alcohol in the amount of 0.19 percent. Mr. Case said, “At this alcohol level a person displays some mental confusion, muscular impairment, and possibly has a staggering gait.”
Police Officer Kerry Gwin McKleroy of the City of Heflin testified that he and another officer were sent to the place where the shooting occurred and arrived at about 8:30 p. m. He said they were the first officers to reach the scene. He said that appellant was not at her home. He saw the man who had been shot lying on the ground beside an automobile. The car lights were on and the door on the driver’s side was open but the motor was not running. He further stated that he personally knew the deceased and that the automobile belonged to him.
*164 He further testified that the only two people present who were known to him were Kelly Cunningham and Seletha Braz-zell. He stated when they arrived that Cunningham and Brazzell were around the body of the deceased and in a few minutes the brother of the deceased arrived. He said that the first thing he observed was Kelly Cunningham and Seletha Brazzell were around near the victim and he told them to stand back. He stated that he then got down over the victim and asked who shot him and he replied, “Christine,” and that this was in a low whispered tone. He said he was about two and one half inches from the victim’s mouth so that he could hear his answers. This officer asked the deceased how he was shot and the only thing he could say was “rif.”, and that his eyes rolled back in his head, and that in the opinion of the officer he was dying.
From the record:
“The Court: Let me ask you something. Was his eyes rolled back and mouth hanging open before he spoke or after?
“A: After.
“The Court: After he spoke, I see. All right. Thank you.”
Appellant’s counsel objected to this testimony on the “ground it doesn’t come under the rule.”
“THE COURT: I overrule the objection and will allow this testimony as a dying declaration. The jury is entitled to infer, and, of course, I am entitled to infer, that Mr. Johnson had requested assistance in getting to the hospital, had stated that he was shot — not that he was dying or that it was serious, or anything else; but simply that he was shot and wanted to go to the hospital — that he had spread blood around pretty well, he had bled in the car, the lights were on, the car was angled sort of across the road and partly off the road, the left door was open, and he was lying on his back, and Christine' — not Christine — Seletha Brazzell stated probably within two or two and a half feet of the man’s head that, ‘he’s dying.’ I believe we are all entitled to infer from that that he knew he was dying and that he made a statement as to the cause of his death and the person responsible; and he did die. I believe that really covers the elements of a dying declaration.”
Both Seletha Brazzell and Kelly Cunningham were present at appellant’s home prior to the difficulty leading up to the killing of the deceased. According to their testimony all parties present that night had been drinking beer, vodka, and whiskey. Appellant had gone to Anniston to buy an automobile for the deceased as a Christmas present as he had wrecked his car, but they did not bring the car home as there was something mechanically wrong with it. Appellant left the deceased and returned home. Kelly Cunningham was rooming with appellant and the deceased.
Appellant asked Cunningham to take the car to a service station and put two or three dollars worth of gas in it. When the deceased came home he got into an argument about why she permitted Cunningham to drive the car. The argument became heated and the deceased told appellant that he had to walk all the way from Anniston.
Appellant and the deceased kept arguing and the deceased picked up a long gun and started waving it around. He did not point the gun at anyone but put it down and said, “I’m getting the hell out of here,” and walked out the front door. According to Brazzell the appellant picked up the rifle and followed the deceased out the front door and in a minute she heard a shot. She then saw appellant come back in the house and get her pocketbook and told Cunningham to hide the beer and whiskey as the cops would be there in a few minutes. Appellant then left her house and went to her daughter’s house. She further testified that in a few minutes the deceased came back in the house and told Cunningham he had been shot. Cunningham told him he could not drive him to the hospital as he did not have a driver’s license and that he was also drunk and might get arrested. The deceased was bloody and he walked through several rooms leaving a trail of blood. The *165 deceased then walked out the door and got in a car to drive himself, but she did not hear the car crank.
She and Cunningham went outside and found the deceased lying near a ditch beside his car and she felt his pulse and told everyone around that he was dying. She stated the deceased was trying to say something but “the white stuff started bubbling out of his mouth.” At this point the officers and the ambulance arrived and they took the victim to the hospital. He was dead on arrival in the emergency room.
On cross-examination she stated that when the deceased came in the house he got into an immediate argument with the appellant and this argument lasted about thirty minutes. She heard the deceased tell appellant that he was going to “blow her _away,” but he walked out the house without pointing the gun at anyone. She further testified that when she and Cunningham went out the front door they stumbled over the rifle on the front porch and that Cunningham started to pick up the gun, but she told him not to touch it.
On examination by the Court this witness testified that she first saw the deceased with a gun but when he walked out the front door she did not see a gun.
Kelly Cunningham testified that he was rooming with appellant and the deceased at the time of the shooting. He testified that when the deceased came home that night he got into an argument with appellant in the bedroom; that a few minutes later the deceased came out and started to leave the house; that he saw appellant come out with a rifle in her hand and follow the deceased to the front door and she was saying, “I’m going to kill the SOB”, and he saw appellant on the front porch with a rifle in her hand and he heard one shot. In a few moments she came back inside the house and said, “I think I shot the SOB”. She further said “you had better hide the whiskey, because the cops will be here in a few minutes.” He picked up the whiskey and hid it.
Brazzell and Cunningham were both carried to police headquarters and given their Miranda rights and warnings. After they both signed statements concerning the shooting they were released from custody.
Appellant testified that when the deceased came home that night they got into an argument and the deceased slapped her. After he slapped her she got her pocketbook and went to her daughter’s house. She denied shooting the deceased and denied telling Cunningham to hide the whiskey as the cops would be there in a few minutes. She claimed she heard about the shooting only after the officers came to her daughter’s house and arrested her. In short, she knew nothing about the shooting of her common-law husband.
On cross-examination she was asked if she was convicted in the Circuit Court of Cleburne County, Alabama, of manslaughter in the first degree on September 26, 1955, and she said, “Yes.” She was further asked if she was convicted of first degree manslaughter on October 1, 1970, in the Circuit Court of Calhoun County, Alabama, and she answered, “Yes.” Both of these questions were objected to on the ground that the proper predicate had not been laid. These objections were overruled.
Appellant’s counsel then moved for a mistrial stating:
“That Mr. Merrill asked this defendant about two prior convictions in the Circuit Court of this County and Calhoun County, when there was no probative value to them; the requirements by law had not been met prior to showing such convictions; that it was just introduced for the sole purpose of prejudicing the minds of the jury and attempting to get excessive or greater punishment.”
“The Court: I am going to overrule. I will say this, as I understand it, it is always proper to ask the defendant whether he or she admits the conviction before offering a certified copy of the record. If the defendant admits it, then there is no need to offer the certified copy. Now, the other point, as far as I can tell, is whether Manslaughter in the First Degree involves moral turpitude; and I am ruling that it does.”
*166 At the close of the State’s case appellant made a motion to exclude the evidence for failure to make out a prima facie case and other grounds. This motion was overruled. There was no request for the affirmative charge; no exceptions were reserved to the Court’s oral charge to the jury, and no motion for a new trial was made.
Manslaughter in the first degree is a crime involving moral turpitude and under Title 7, Section 435, Code of Alabama 1940 (now 12-21-162, Code of 1975), a defendant may be asked, for impeachment purposes, if he had been previously convicted of such a crime. Rush v. State, 253 Ala. 537, 45 So.2d 761. An oral admission of such a conviction dispenses with the necessity to introduce a certified copy of the judgment of such conviction. When a witness denies his conviction of the offense inquired about, it can be proven by the Court record of his conviction or by a properly certified copy thereof, as required by law. Ellis v. State, 244 Ala. 79, 11 So.2d 861.
In McElroy’s Alabama Evidence, Third Edition, (Gamble), Section 145.01(15), it is stated:
“The most common manner of eliciting a witness’ former conviction for a crime involving moral turpitude, as a means of impeaching his credibility, is to question him on cross-examination regarding such conviction. This, of course, is a prerequisite to any attempt by the impeaching party to introduce independent evidence of the conviction. If the witness answers in the affirmative to the question of whether he has been convicted of the crime then it is not necessary for the impeaching party to go further with any proof of the conviction.”
The trial court did not err in permitting the prosecution to cross-examine appellant concerning two prior convictions for the crimes of manslaughter in the first degree. Appellant admitted on cross-examination that she had previously been convicted of manslaughter in the first degree in the Circuit Courts of Cleburne and Calhoun Counties.
Appellant contends that the State did not prove that the body which the Toxicologist performed a postmortem on was the body of the deceased. Her argument is that it could have been the body of any black male. This contention is completely refuted by the testimony of the Toxicologist. Photographs of the deceased taken at the hospital where he was transported, and where he was pronounced dead on arrival, were shown to the Toxicologist and he positively identified the deceased, James C. Johnson, as being the man on whom he performed the autopsy. There was not one thread of evidence tending to show that the body of the deceased was not in the same condition when it was transferred from the hospital to the Auburn morgue for the autopsy.
We have carefully searched the record for errors injuriously affecting the substantial rights of appellant and have found none. The conflicting testimony of appellant with that of the State’s witnesses presented a jury question and the jury resolved that issue adversely to appellant. Ala.Dig.Crim.Law <3=1159.3(1).
The judgment of conviction is affirmed.
AFFIRMED.
All the Judges concur.