HARRIS, Presiding Judge.
Appellant was convicted of robbery and sentenced to ten years imprisonment in the penitentiary. During the trial proceedings he was represented by counsel of his choice and at arraignment pleaded not guilty. After sentence was imposed he gave notice of appeal. He is represented on this appeal by trial counsel.
At the conclusion of the State’s case appellant made a motion to exclude the State’s evidence. After considerable argument the motion to exclude was overruled and denied.
The indictment, omitting the formal parts, charged:
“The Grand Jury of said County charge that, before the finding of this indictment Terry Wayne Winslett, alias Terry Win-slett, alias Terry W. Winslett, whose name to the Grand Jury is otherwise unknown, feloniously took and carried away the sum of $350.00 in lawful money of the United States, the exact description and denomination of which is to the Grand Jury otherwise unknown, the property of The Great Atlantic and Pacific Tea Company, Incorporated, a corporation, from John Smith, against his will and from his person, by violence to his person or by putting him in such fear as unwillingly to part with the same, against the peace and dignity of the State of Alabama.”
The evidence adduced by the State tended to show that the A & P Store located on Blount Avenue in Guntersville, Alabama, was robbed on the night of March 12,1973. The manager, Mr. John Smith, was shot and killed during the course of the robbery. Appellant was indicted during the 1978 term of the grand jury.
The State’s brief contains an accurate summary of the testimony had during the trial and we adopt this summary as the facts in the case.
Mr. Gerald Bryant testified that he was a former Guntersville policeman and was employed in that capacity on March 12, 1973. Bryant testified he received a phone call on the evening of that date from Mrs. Smith who asked him to go to the A & P food store to check on her husband whom she had tried unsuccessfully to reach by phone.
Bryant went to the A & P store on Blount Avenue in Guntersville, where he observed the glass broken out of the front door and where he found Mr. Smith lying in a pool of blood in the office area. Officer Bryant remained and protected the scene until the state toxicologist arrived. Bryant testified that Mr. Smith was dead.
Mr. Thomas Maltbie testified he was formerly with the Marshall County Sheriff’s Office and was so employed on March 12, 1973. On that date he went to the A & P store in Guntersville where he observed Mr. Smith lying face down, dead, in his office.
Maltbie remained at the scene until the toxicologist arrived and then accompanied the body of Mr. Smith to the Carr Funeral Home in Guntersville. Maltbie testified *1336 that the wounds on the body were in the same condition when Toxicologist Van Pruitt arrived at the funeral home as they had been in when the body was removed from the A & P store.
Mr. Ernest W. Broderick testified that he was district manager for the Great Atlantic & Pacific Tea Company, commonly known as A & P. He testified he was also with A & P on March 12, 1973, and arrived at the Guntersville A & P store about 11 o’clock that evening. Broderick audited the store’s books, along with Mr. Winston Mann, the store’s assistant manager. They determined that $1,139.11 was missing from the store, that the missing money was the property of the Great Atlantic & Pacific Tea Company, Inc., and that it was U.S. currency-
Mr. Brent Allen Wheeler testified that he was employed with the Alabama Department of Forensic Sciences and that he participated in autopsies to determine the cause of death in cases of death by violence. He testified he was so employed on March 12, 1973, and that he went to the Gunters-ville A & P store that evening, arriving after 11:00 p.m.
Mr. Wheeler described the scene as he observed it at the A & P, including the broken out glass door and the body of a white man lying on the floor of the office. He described bloodstains in the area, footprints in the blood, the open safe, and the cash register trays. Mr. Wheeler also testified that a bar was down on the rear door and the door knob was broken off.
Mr. Wheeler identified seven photographs of the scene which he had taken and which were admitted into evidence as state’s exhibits.
Mr. Wheeler then testified that he took part in the autopsy of the body of Mr. John Smith at the Carr Funeral Home in Gun-tersville. He testified that eight .22 caliber lead projectiles were removed from the body and that he took photographs of the body.
Five photographs of John Smith’s body, showing the nature and extent of the wounds to the body, were introduced through Mr. Wheeler, over objection.
Mr. Wheeler testified that Toxicologist Van Pruitt, Jr. worked with him on the autopsy and that it was Pruitt who made the determination of cause of death.
On cross-examination, Wheeler testified that he had made a list of latent fingerprint lifts from the scene and had later submitted the lifts to the Department of Public Safety for comparison. He testified that latent fingerprints found at the A & P store were compared with the fingerprints of the defendant and that they were not his prints.
On redirect examination, Mr. Wheeler testified that he had erred as to the date in his original, direct testimony, that he had actually arrived at the scene on the evening of March 12, 1973, and the autopsy was commenced at 2:20 a.m. on March 13, 1973 at the Carr Funeral Home.
Mr. A. G. Lang testified that he was an investigator with the Marshall County Sheriff’s Department and had been so employed for nearly five years. He testified he had worked on the investigation of the 1973 robbery of the Guntersville A & P during which Mr. John Smith was killed.
Lang testified that he had spoken to the defendant, Winslett, at the Montgomery County Jail on March 24, 1977, in connection with his investigation of the A & P robbery.
Outside the presence of the jury, Lang testified that Chief Deputy Lacy Galloway and Investigator James Maze were with him when he spoke to the defendant on March 24, 1977. Lang testified they informed the defendant as to why they were there, at which time the defendant became very nervous and pale. Lang observed the defendant’s hands shaking at that time.
Lang testified that at that point he read the defendant his Miranda rights from a standard Miranda card, which Lang then read for the court. Lang testified that the defendant stated he understood his rights, that the defendant did not appear to be intoxicated or under the influence of drugs, that no one offered or promised the defend *1337 ant any reward, that no one threatened or coerced the defendant into making a statement, and that the defendant then did proceed to make a statement.
Lang testified they took a break after Winslett made his statement, after which he went back over the statement with the defendant. Lang testified he had written the statement down and that he let the defendant read it. Lang testified the defendant told him a portion of what he had written was not correct, and he testified that he changed that portion of the statement. The defendant then read the entire, corrected statement after which he told Lang that it was true and accurate, and the defendant signed each page of it in Lang’s presence.
Lang also testified that the defendant had signed a written form which explained his Miranda rights in substantially the same wording as the card Lang had read to the defendant.
On cross-examination, still outside the presence of the jury, Deputy Lang testified that they had gone to see the defendant because of a letter the defendant had mailed to Chief Deputy Lacy Galloway stating that he might have some information to provide.
Lang testified that he was not positive whether or not the interview, or any part of it, had been tape-recorded. He testified that he and the other two deputies all went in to see the defendant at the same time. He testified none of them discussed with the defendant the possibility of doing any favors for him prior to his making the statement. He testified that, after the statement was made, he told the defendant he could get with his attorney and the prosecution to discuss the possibility of his being a witness. Lang testified he did not tell the defendant that he would help him out on his escape charge if the defendant would make a statement.
Lang was shown defendant’s exhibit # 1, a five-page statement, and he testified he did not know where it came from, that it appeared to be a transcription of a type recording, that he remembered a portion of what was in the transcription, and that it was probably the oral statement the defendant had made to him at the Montgomery County Jail. He testified that presumably the tape recorder had been turned off after the oral statement, and he then wrote out the substance of it. He testified that he wasn’t sure who was operating the tape recorder. He testified that he didn’t know what portion of the conversation was contained in the defense exhibit # 1, but that it was a part of the conversation with the defendant.
Lang testified that he did not know where the tape recording itself was located. He testified he did not remember telling the defendant that he would not get his wife in trouble by telling about the robbery. He testified that the defendant would sometimes ask them to turn the recorder off and that they would talk and then turn it back on.
After lunch recess, Deputy Lang testified that he had gone over the transcript, defendant’s exhibit #1, and recalled it more fully than before lunch. He testified that the point at the top of page 5 of defendant’s exhibit #1, where he asked the defendant whether he could think of anything that was missed, was the point at which the tape recorder had been turned back on after having been earlier turned off.
Lang testified that the defendant signed the waiver of rights form, defendant’s exhibit #2, the first thing, prior to talking about the robbery. He testified the tape recorder was turned on and off from two to four times during the interview.
Lang, still on cross-examination, repeated his earlier testimony that they had informed the defendant at the Montgomery County Jail of the purpose of their visit, that they had read him his Miranda rights from a card, that he had then read his waiver of rights form and signed it in their presence.
*1338 Lang testified that page 2 of the defendant’s statement, defense exhibit #2, was partially blank with a diagonal line across the bottom containing the defendant’s signature because the defendant had stated that some of what was written in the original page 2 was incorrect and so Lang had rewritten page 2 only, deleting the material the defendant told him was incorrect.
He testified that page 3 of the statement, relating to the planning of the robbery, was an accurate rendition of what the defendant had told him. Lang acknowledged that the reference in the handwritten statement, defense exhibit #2, to Vickie Oliver’s being present during the planning of the robbery was at variance with page 4 of the transcript, defense exhibit # 1, which indicated that the defendant had stated Vickie Oliver was not present. Deputy Lang testified he did not note this discrepancy during the interview with the defendant.
He testified that he had not told the defendant that he would have him moved back to the Marshall County Jail and had not told the defendant that he would help him with the escape case pending against him in Montgomery County. Lang testified he remembered some discussion about the defendant’s wife and her present husband, but did not remember telling the defendant that it was okay to tell if his wife knew anything about the robbery.
Lang testified he did not tell, or imply to, the defendant that the defendant would not be prosecuted for the robbery. He testified that he had not gone to look for the money bag and a gun after taking the statement from the defendant. He testified that he had not located the tape recording from which the transcription, defendant’s exhibit #1, had apparently been made.
Lang testified that when the defendant had become pale and nervous with shaking hands at the Montgomery County Jail he did not appear to be ill, and Lang could not remember if he was perspiring. He testified the defendant had not told him that he had a lawyer at the time.
On redirect examination, still outside the presence of the jury, Deputy Lang again testified that the defendant had been read his Miranda rights and had, himself, read and signed his waiver of rights form prior to his making any statement concerning the robbery in question. He testified that the defendant went over the same statement of facts twice during the interview, and that the written statement, defendant’s exhibit #2, was not written from a tape recording but was written out as the defendant repeated the same facts after having already related them once.
On recross-examination, still outside the presence of the jury, Deputy Lang testified that defendant’s exhibit # 3 appeared to be the letter to Chief Deputy Lacy Galloway from the defendant, Winslett, that Mr. Galloway had told Mr. Lang about.
Marshall County Chief Deputy Sheriff Lacy Galloway was called by the defense to testify, outside the presence of the jury, on the question of the admissibility of the defendant’s confession. He testified that he went with Deputy Lang and Deputy Maze to the Montgomery County Jail on March 24, 1977, and spoke with the defendant there.
Galloway testified that he had known the defendant previously and didn’t notice anything different about him on this occasion. He testified that the defendant had written to him from Draper Prison and he identified defense exhibit #3 as a copy of that letter. He testified that the letter, dated August 12, 1976, was the only communication from the defendant that he recalled prior to his visit with the defendant at the Montgomery County Jail on March 24,1977. He testified that, on August 11, 1976, he had had a personal conversation with the defendant at Draper Prison where he had gone with A.B.I. Lieutenant Bryant to discuss the A & P robbery-murder with the defendant. He testified that the defendant stated little more on August 11 than that he had “heard about” the A & P robbery-murder.
*1339 Galloway testified that, prior to the August 11 visit with the defendant at Draper, he had spoken with the defendant in the Marshall County Jail perhaps two or three times about the A & P robbery-murder and that the defendant had stated on those occasions he had no knowledge about the crime.
Chief Deputy Galloway testified that, during the August 11 visit at Draper, he and the defendant discussed the possibility of the defendant’s being transferred to the Marshall County Jail to be near his family while he served the short remaining time on his sentence. Galloway testified that he understood the defendant had escaped from Draper shortly after Galloway received the letter, defense exhibit #3, and that the defendant had told him during the subsequent visit in the Montgomery County Jail that he had an escape charge against him then.
Galloway testified he did not respond to the defendant’s letter, defense exhibit #3, since the defendant escaped shortly after mailing it. He learned that the defendant was recaptured and in the Montgomery County Jail a few days before going to Montgomery to speak with the defendant.
Galloway testified the defendant told him in Montgomery that he had some attorney trying to make a deal for him on the escape charge, but Galloway couldn’t recall the attorney’s name. He testified the defendant also asked in Montgomery if it would be possible for him to be brought back to Marshall County, but he couldn’t recall what if anything was said to the defendant in response to that question. Galloway testified he asked an officer in the Montgomery County Sheriff’s Department to place a “hold” on the defendant for Marshall County.
Chief Deputy Galloway testified that neither he nor Lang nor Maze attempted to contact the defendant’s attorney in Montgomery. He also testified that they had a tape recorder with them in Montgomery and Deputy Lang operated it.
Galloway testified that he and Lang and Maze recorded the initial interview with the defendant, then took a break and had a Coca Cola, and that Lang and Maze then went back in to talk to the defendant again while Galloway remained outside. He testified that the defendant’s signed statement, to the best of his knowledge, was written out during the second interview when only Lang and Maze were in with the defendant. Galloway testified that he did not operate the recorder during the first interview and that he didn’t know when it was turned off and on.
Chief Deputy Galloway testified that, when he and Maze and Lang arrived at the Montgomery County Jail, the defendant was brought into the room where they were. Deputy Lang said to the defendant, “I guess you know why we’re down,” and the defendant replied, “I guess so.” The defendant was then advised of his rights before being questioned. He testified that he did not take the defendant’s letter, defense exhibit #3, to Montgomery on that occasion and couldn’t remember whether any reference was made to it during the conversation in Montgomery. He also testified that the transcript, defense exhibit # 1, appeared to be a transcript of the tape made in Montgomery, but that he did not know when the recorder was turned on.
Galloway testified that he did not recall the conversation with the defendant about his wife, even after reading it from the transcript, defense exhibit #1.
Galloway testified that neither he nor anyone in his presence indicated to the defendant that there was anything that Marshall County or anyone else could do to help him, in either the conversation of August 11, 1976, or the conversation of March 24, 1977.
He testified that it was his recollection that the defendant told him during the conversation at Draper Prison that he didn’t know Vickie Oliver, and he testified that he didn’t recall Vickie Oliver’s name coming up during the Montgomery conver *1340 sation. He testified that he saw the four-page, handwritten statement of the defendant shortly after they left Montgomery.
Chief Deputy Galloway finally testified that on no occasion had he told the defendant that it would be better for him to go ahead and tell if he knew anything about the A & P robbery.
Defendant’s exhibit #1, #2, and #3 were then admitted into evidence without objection from the state.
Deputy A. G. Lang was recalled by the defense for further questioning, on the issue of the admissibility of the defendant’s confession, and testified that he returned to Montgomery four days after taking the signed statement from the defendant and took with him Mr. Leon Green, a polygraph operator, who administered a test to the defendant. Lang testified that he was never informed of the results of the polygraph examination and that he did not know whether or not the polygraph examiner made a report on the examination.
The jury was returned to the courtroom and Deputy A. G. Lang testified again, this time before the jury, about his visit with the defendant at the Montgomery County Jail on March 24,1977, when he was accompanied by Chief Deputy Lacy Galloway and Investigator James Maze. Lang again testified about their informing the defendant that they were there concerning the A & P robbery, about the defendant’s becoming nervous and pale with his hands shaking, about the Miranda rights being read to the defendant, about the defendant’s stating that he understood his rights, and about the defendant’s reading and signing the waiver of rights form.
The waiver of rights form was admitted into evidence, over defense objection, as state’s exhibit #14.
Deputy Lang again testified that the defendant had not appeared to be intoxicated or under the influence of drugs, that he had not been promised or offered hope of reward, and that no one had threatened or coerced him into making a statement. He again testified that the defendant then made a statement to them.
Deputy Lang then testified before the jury that the defendant had told him in Montgomery that he had participated in the A & P robbery by driving the car, that Jackie Grant and Junior Parker actually went in the store and performed the robbery, that they later told him they had shot Mr. Smith, and that he only got $350 of the stolen money because he had not done as much as Grant and Parker had.
Lang then again testified that the defendant went through his story a second time, during which Lang wrote down the essence of what the defendant told him in a four-page statement, which the defendant signed after Lang rewrote page 2 in order to correct it. The four-page written statement, bearing the defendant’s signature on each page, was then offered and admitted into evidence as state’s exhibit #15.
Deputy Lang testified on recross-examination, before the jury, that he did not recall what was contained on the original second page of the defendant’s written statement which was incorrect, resulting in his rewriting page 2. He testified that he had a tape recorder at the interview and recorded the defendant’s oral statement. He testified that the defendant did not ask for any favors and none were promised to him.
Lang further testified that he had asked the defendant to tell him whether the defendant’s wife knew anything about the A & P case because he would not be getting her in trouble. The defendant then indicated to him that his wife had no knowledge of the case.
Lang testified that he did not tell the defendant that he knew Junior Parker and Jackie Grant had committed the crime and that he just wanted to convict them.
He testified that he could not remember whether it was he or the defendant who brought up the name of Vickie Oliver during the conversation.
*1341 Lang further testified that some considerable time after the A & P robbery a witness had come forward who claimed to have seen Junior Parker and Jackie Grant running away from the A & P store on the night of the murder-robbery. Lang testified that he had asked the defendant to tell him about Parker and Grant and the “whole situation.” He did not tell the defendant that he would not be prosecuted for the crime if he told about it.
Deputy Lang further testified that the March 24, 1977, conversation in Montgomery was the first time he had talked with the defendant, that Chief Deputy Galloway and Investigator Maze were with him, and though Galloway was not present the entire time, Maze was.
He testified that the defendant read over the waiver of rights form for approximately five minutes and seemed to understand it. He testified Investigator Maze filled out the blanks on the waiver of rights form in the defendant’s presence.
Lang again testified that the first interview with the defendant was tape-recorded and that he then had the defendant go through the facts again while he wrote out the statement by hand that the defendant signed.
Lang testified that he told the defendant that it was his opinion that Mr. Smith would not give the money up to Parker and Grant and so they used force to take it but they had not planned to do so. He testified the defendant told him that, when Parker and Grant came out of the A & P and got in the car that he was driving, they drove to Parker’s grandmother’s house where Parker told Grant he had shot Mr. Smith because he “had to.”
Leon Green testified that he was an investigator with the Madison County Sheriff’s Department and a former U.S. Army military police investigator.
Green testified that, at the request of the Marshall County Sheriff’s Department, he spoke with the defendant at the Montgomery County Sheriff’s Office on March 28, 1977. He stated he introduced himself to the defendant and then read the defendant his Miranda rights from a card which Green then read in open court. He testified the defendant then signed a waiver form and that he had the form with him in court.
At this point the jury was removed from the courtroom and Mr. Green testified, outside the jury’s presence, that state’s exhibit #16 was the waiver that the defendant had read and signed in Green’s presence. Green testified the defendant had not appeared to be intoxicated or under the influence of drugs, that no one offered him or promised him any reward or hope of reward, and that no one had threatened or coerced the defendant into making the statement to Green.
Green testified that the defendant told him that the pistol used in the 1973 Gun-tersville A & P robbery-murder had been sold to one Jim House, that the defendant had driven the robbery car and parked in the back of the A & P store, that Grant and Parker went into the store, that the defendant heard some shots from the store, that Grant and Parker then returned to the car, that Grant asked Parker why he had killed the man, that Parker had not answered the question, that the defendant had gotten $350 as his cut from the robbery, that, when he and Parker were later in jail together, Parker had told him not to say anything, and that he did not know anything about a hammer that had been found. Green testified the defendant also told him that a pistol had been displayed by Junior Parker in a motel room prior to their going to the A & P store.
On cross-examination, still outside the presence of the jury, Investigator Green testified that he had no written notes prior to speaking with the defendant, but that he made some notes of his conversation, which he handed to Defense Attorney Brown in open court. Green testified he read the defendant his rights from a card that was separate and apart from the waiver form that the defendant then read and signed.
*1342 Green testified that neither he nor anyone else told the defendant that it would be to his benefit to give another statement about the robbery.
Investigator Green then testified that he had not at any time told Deputy Lang or anyone else that it was his opinion that the defendant had not driven the robbery car and split the loot. The jury was returned to the courtroom, and Investigator Green testified, in their presence, once again that the state’s exhibit #16 was the waiver of rights form that the defendant had read and signed in his presence. State’s exhibit #16 was then admitted into evidence over defense objection.
Green again testified that the defendant was not threatened or coerced, was not promised a reward or hope of reward, did not appear to be intoxicated or under the influence of drugs, and had made a statement after being advised of his rights. He testified that Deputies A. G. Lang and James Maze were also present at the time.
Mr. Green again testified that he informed the defendant he was there to discuss the 1973 robbery-murder at the Gun-tersville A & P. He testified the defendant then told him that the pistol used in the robbery had been sold to one Jim House, that the defendant drove the robbery car and parked in back of the store, that Grant and Parker had gone into the store, that he heard shots after they entered the store, that Grant and Parker returned to the car, that the defendant got $350 of the robbery proceeds, that Grant asked Parker why he killed the man and the defendant asked Parker if he had killed the man but Parker made no answer, that he and Parker were later in jail together and Parker told him not to say anything, and that he knew nothing of a hammer that was missing from the A & P store.
Green further testified before the jury that the pistol had been displayed by Parker in a motel room prior to the robbery. He testified the defendant told him he had waited in the car outside the A & P for some 20 or 30 minutes before Grant and Parker returned to the car from the store.
On cross-examination, before the jury, Investigator Green testified that the statements the defendant had made to him in Montgomery were in response to his question to the defendant as to what he knew about the A & P robbery. He testified that he had discussed the case with Deputy Lang on the way to Montgomery, that both Deputy Lang and Deputy Maze were present while the defendant was speaking, but that they merely sat and listened to the defendant and Green talking.
At this point the state rested. The defense made a motion to exclude the state’s evidence and it was overruled by the court.
Marshall County Deputy A. G. Lang was recalled by the defense. Lang testified that the present layout of the Guntersville A & P appeared to him to be the same as it had been in March of 1973. Lang then described the layout of the store as Defense Attorney Brown drew it on the courtroom blackboard.
Lang testified that he had spoken with an old gentleman named Hollis Havis in the course of his investigation of the case. Lang testified that he went to Decatur in March of 1977 with Mr. Havis to see if Havis could identify Luther Parker, Jr. Lang testified he could not recall for certain whether he had received any information concerning Hollis Havis prior to the time he went to Montgomery and spoke with the defendant.
Lang testified that, prior to going to Decatur with Hollis Havis, he showed Havis some photographs of persons to see if Havis could identify any of them as being someone he supposedly saw running from the A & P the night of March 12, 1973.
Lang testified that, prior to the time he showed Hollis Havis the photographs, he had received information that the two people running from the A & P were Junior Parker and Jackie Grant.
He testified he first talked to Havis in April of 1977. He further testified that *1343 Havis had been mentioned as possibly having information concerning the ease much earlier. He testified that Parker and Grant were suspects in the case before he talked to Havis and before he talked to the defendant. He testified there were also other suspects prior to March 1977.
Lang testified he could not recall where he first heard that Havis might have some relevant information.
Lang testified he had told the defendant that he knew Parker and Grant were involved in the crime. He did not tell the defendant that he would help him if he would help prove that Parker and Grant were guilty. Lang did not tell the defendant that he knew Parker and Grant had committed the crime and he only wanted the trigger man. He did not tell the defendant that he wanted to prosecute Parker and Grant but not the defendant. He did not tell the defendant he would help him with the Montgomery County authorities.
Lang testified that he spent approximately an hour talking to the defendant in Montgomery on March 24, 1977.
Defendant’s exhibit #1 was re-marked as defendant’s exhibit 1A, and Lang testified he had read most of it and it was probably an accurate transcription of the portion of the interview that was recorded. The transcription was then admitted into evidence.
Deputy Lang testified that he had received information prior to the March 24, 1977, interview with the defendant in Montgomery that Grant and Parker had been seen by Hollis Havis running from the A & P store on the night of March 12, 1973.
On cross-examination by the state, before the jury, Deputy Lang testified again that defendant’s exhibit # 1A, the transcription of the conversation, did not contain everything that was said to or by the defendant in Montgomery, and he repeated that the recorder had been turned off from time to time during the interview. Lang then directed the prosecutor how to redraw on the blackboard the representation of the A & P store and surrounding area so as to make it more accurate.
Lang testified the defendant did not tell him in Montgomery where he had escaped from and did not tell him what he was then serving time for.
Mr. Hollis Havis testified that, on the night of March 12,1973, he drove his pickup truck by the Guntersville A & P store and saw two people run from behind the store, with one of them brushing his truck, and they then ran down the hill toward the railroad. He saw one of them carrying what appeared to be a hammer in his hand. He testified that he did not see a car parked around the A & P.
Havis testified that he had known Luther “Junior” Parker since Parker was a child and that he knew him on March 12, 1973.
Havis testified he later drove back to the A & P, after the police had arrived, and attempted to tell them what he had observed, but that they told him they didn’t need his help and for him to leave.
He testified that in early 1977 he had gone with Deputies A. G. Lang and James Maze to the Decatur area to see if he could identify a man. He testified they showed him some photographs, including one of Parker.
He testified that, after they arrived, he sat in the car and identified Luther Parker as one of the people he had seen running from the A & P. He testified that he had also identified Jack Grant as one of the two he had seen running.
Havis testified that he had told Investigator Bryant within two or three days after the robbery-murder of what he had seen. He testified that it was not until 1977 that they came to him to see if he could identify the man, however. Havis testified that Lang and the Sheriff had come over to him and shown him photographs, including one of Parker, prior to taking him to look at Parker. He testified that the officers had been to see him many times since the robbery-murder.
*1344 Havis testified that the two men he saw running from the A & P did not run to a vehicle, but ran toward the railroad. He testified that Luther Parker, Jr. was one of the two men he saw running from the A & P the night that John Smith was killed.
Mr. Lacy Galloway again testified that he was the Chief Deputy Sheriff of Marshall County and that he had participated in the investigation of the A & P robbery where Mr. Smith was killed. He testified that he talked to the defendant four or five times after the robbery-murder and prior to March 24, 1977. He testified the defendant was a suspect from the beginning, that he never told the defendant that they needed the defendant’s help, or that they would help the defendant.
Galloway testified the defendant did discuss his problems with him, including his desire to be transferred to the Marshall County Jail so he could be near his wife and children. He testified the defendant wrote him a letter and that he and Deputies Lang and Maze went to the Montgomery County Jail on March 24, 1977, and spoke with the defendant. He testified that Deputy Lang asked the questions and wrote some things down.
Galloway testified he was not present when Deputy Lang wrote out the statement which the defendant signed.
Galloway testified that the defendant told him he had a pending escape charge against him in Montgomery and that the prosecution there had offered the defendant a deal on a guilty plea that did not satisfy him.
Galloway further testified that the defendant discussed his desire to come back to Marshall County on each occasion that he spoke with him. In the spring or summer of 1977 he learned that the defendant had been released from jail.
Galloway testified that neither he nor Maze nor Lang had told the defendant in Montgomery County to have his attorney call him.
Galloway testified he recalled Deputy Lang tape-recording the conversation with the defendant and remembered the recorder being turned on and off during the conversation. He testified that he did not indicate to the defendant that he might be able to have him transferred to Marshall County.
Galloway testified that Parker and Grant were charged with murder in the A & P case, and the defendant was charged with robbery.
On cross-examination by the state, Chief Deputy Galloway testified that the defendant had been a suspect in the case from the beginning.
He testified that he was present during the entire first part of the Montgomery interview with the defendant, that he heard Deputy Lang read the Miranda rights to the defendant and heard the defendant say that he understood them, that he saw the defendant read the waiver of rights form, heard him say he understood it, and saw him sign it. He then identified state’s exhibit # 14 as the waiver of rights form that the defendant had signed.
He testified that no one threatened or coerced the defendant into signing the waiver or making a statement, that no one promised or offered the defendant any reward or hope of reward to make a statement, that the defendant had not appeared to be intoxicated or under the influence of drugs, that the defendant then related that he and Parker and Grant planned the 1973, Guntersville A & P robbery and that he had driven the getaway car, and that Parker and Grant went in the store and performed the robbery and killed Mr. Smith, and that the defendant had gotten $350 out of the robbery.
Mr. Galloway testified that he knew the defendant’s wife as a result of a number of criminal charges against her in Marshall County.
On redirect-examination Galloway testified the defendant had stated that he *1345 parked the car at the back corner of the A & P.
He testified that the bottom of the second page of the defendant’s signed statement, state’s exhibit # 15, appeared to have been the end of a statement.
Terry Wayne Winslett took the stand in his own behalf and testified that he grew up in Jefferson County, that he knew Mr. Galloway and had met Mr. Lang, that he had married a girl from Marshall County and was now divorced, that he remembered talking to Lang and Galloway and Maze in Montgomery in March 1977, that he recalled signing his name on each of the four pages of his written statement, and that he recalled talking to Lang while a tape recorder was running concerning the A & P ease.
He testified he first spoke with Galloway about the A & P case in 1973 after being jailed on a forgery charge. He testified Galloway talked to him on other occasions about the case prior to his coming to Montgomery to see him.
He testified that he was not at or near the Guntersville A & P on the night that Mr. Smith was robbed and killed and that he might have been at his sister-in-law’s house. He testified that he had told Chief Deputy Galloway on a number of occasions that he didn’t know anything about the A & P robbery-murder. He testified Galloway visited him at Draper Prison in August 1976, while he was serving time for forgery. He testified that he talked to Galloway about his wanting to come back to Marshall County to be near his family. He testified that Galloway indicated he might be able to help him get assigned to the Marshall County Jail.
The defendant testified that he subsequently escaped from the Montgomery Work Release Center and later turned himself in but was charged with escape in Montgomery County. He testified that was the reason he was in the Montgomery County Jail in March of 1977.
He testified the Montgomery County authorities offered him a four-year sentence if he would plead guilty on the escape.
He testified that, on March 24, 1977, in the Montgomery County Jail, he did tell the Marshall County deputies that he had driven the robbery car for Parker and Grant, but that it was not true. He testified he told them that so as to get back to Marshall County. He testified that they had indicated they would assist him in that if he told them something to help convict Parker and Grant.
The defendant also testified that he had told the Marshall County deputies that he had gotten $350 from the A & P robbery but that he had only made that up. He testified he had not participated in the March 12, 1973, A & P robbery in Gunters-ville and that he did not know who did.
The defendant testified that he had been approached six or seven times prior to March 1977 by people asking him to tell them something about the A & P case.
He testified that Mr. Galloway had left the room after part of the interview in Montgomery and that Mr. Lang remained with him for some twenty or thirty minutes after that. He testified that a few days after that Mr. Lang came back to Montgomery with a lie detector expert from Huntsville, Mr. Green. He testified he did not see the Marshall County authorities again until a few days prior to this trial.
He testified that he gave the statement at the Montgomery County Jail on March 24, 1977, and that he was released from jail in May of that year. He testified that he was sentenced to time served on the escape charge in Montgomery County and was released the next day after Marshall County had removed the “hold” that it had on him for murder and robbery. He testified that he had a conversation with someone in Marshall County prior to his release from Montgomery County, that Marshall County did not send a warrant on him to Montgomery County, and that he was released within two months of the time he had signed the confession.
On cross-examination the defendant testified that he had signed state’s exhibit # 15 *1346 on each page after reading it. He testified that he was not forced to sign it or to do anything.
The defendant testified that Chief Deputy Galloway had told him at Draper in 1976, in response to his request, that he would “see about” having the defendant moved back to the Marshall County Jail.
The defendant testified that he was convicted in 1973, in Marshall County, of forgery. The defendant testified that he did not remember whether he was convicted on July 19, 1974, of grand larceny. He then testified that he recalled pleading guilty to grand larceny in Marshall County on May 21,1973; and being sentenced to two years six months and twelve days. The defendant testified that he was convicted in 1974 for the felony offense of buying, receiving or possession of stolen property. He testified that he could not remember whether he had been convicted of forgery on another occasion besides the 1973 conviction he had already testified about. He testified he could not remember whether he had been convicted in Jefferson County of second degree burglary. He testified he was convicted of robbery in 1977 in Birmingham. He testified he was also convicted in Birmingham in .1977 of felony violation of the Uniform Controlled Substances Act. He testified that he could not remember the date of his Montgomery County conviction for escape.
The defendant testified that he had confessed to the A & P robbery in order to get back to Marshall County and get out of jail.
On redirect-examination, the defendant testified that, at the Montgomery County Jail in March of 1977, before the tape recorder was on, Deputy Lang had indicated to him that he would be a state’s witness and that he might be charged with the crime but that the charges would be dropped.
On recross-examination, the defendant testified that Mr. Maze, Mr. Galloway and somebody “from the FBI or BBI” were present when Deputy Lang hold him he would be a state’s witness and the charges against him would be dropped.
On being recalled to the stand by the defense, Chief Deputy Galloway testified that the defendant had made it clear to him, when he spoke with the defendant at Draper Prison in August 1976, that he wanted to get back to Marshall County, but he testified that he did not tell the defendant he would assist him to get back to the Marshall County Jail.
Galloway testified that he did not believe that he had previously testified in this case, outside the presence of the jury, that he had told the defendant that he would endeavor to help him get moved to the Marshall County Jail.
On recross-examination, Galloway testified that Deputy A. G. Lang had not told the defendant in Galloway’s presence, in Montgomery on March 24, 1977, that the defendant would not be charged but would be a state’s witness.
In the presence of the jury, the court received, as defense exhibit #3, a letter purportedly from the defendant to Chief Deputy Galloway. The court reporter then read for the jury a portion of Mr. Galloway’s testimony from the day before, which was offered by the defense for impeachment purposes.
The defense then rested, and the state offered no rebuttal.
Appellant did not file a pretrial motion for discovery seeking to obtain any confessory statements made to the investigating officer. However, at arraignment the District Attorney made known to appellant’s counsel that he had a transcript of a tape-recorded statement made by appellant and furnished a copy of same to counsel. During the trial it came to light that appellant had made two other statements to the investigating officers. One of these incriminatory statements was a signed confession by appellant that he was the driver of the *1347 getaway car after the robbery-murder. Comparing this signed statement with the tape-recorded transcriptions shows no inconsistency. Stated another way, the tape-recorded transcript and the signed statement were identical in all material respects. The other alleged statement was an oral interview with another officer who only made some notes during the interview. This cannot be said to be a signed statement.
In Cooks v. State, 50 Ala.App. 49, 276 So.2d 634, this Court held:
“Notes or memorandums personally compiled by law enforcement authorities in the course of their investigation, even if they include notes of conversations with the accused, constitute the work product of the state and are privileged from pretrial discovery.”
Appellant relies on Allison v. State, 281 Ala. 193, 200 So.2d 653, but such reliance is misplaced. In Allison the Court held:
“On this appeal counsel for appellant argue that error affects this record because counsel who represented the appellant in the murder trial were denied the right to examine the written confessory statement made by the appellant prior to its submission into evidence. The record does not sustain this argument. So far as disclosed no pretrial motion to examine the statement was made, and when during the trial defense counsel did request the court to grant a recess and to permit them to examine the statement, such motion was granted. There is therefore no merit in this contention.”
On voir dire out of the presence and hearing of the jury, as well as before the jury, counsel for appellant extensively examined and cross-examined all officers who interviewed appellant before the trial court ruled the statements were voluntarily, understandingly and intelligently made before they were admitted into evidence.
It cannot be validly claimed by appellant that he was in any way injured by the fact that his counsel did not have a copy of his signed confession as the record clearly shows that it was nothing more than a condensation of what he stated to the officers in the tape recorded conversation, a copy of which was voluntarily furnished defense counsel. Moreover, the record clearly reveals that the trial prosecutor, while aware of appellant’s signed confession, was unaware of the more lengthy recorded statement of appellant which his counsel had and which he used effectively in cross-examining the state’s witnesses.
Appellant next contends that questions propounded to him by the prosecutor concerning his prior felony convictions, along with references by the prosecutor in closing argument to appellant’s criminal record, made a fair trial impossible. We do not agree.
Oatsvall v. State, 57 Ala.App. 240, 327 So.2d 735, makes clear that prior convictions may be proven by the testimony of the defendant himself.
To the same effect is the holding of this court in Johnson v. State, Ala.Cr.App., 357 So.2d 162, certiorari denied, Ala., 357 So.2d 166.
On cross-examination appellant admitted that he was convicted in Marshall County in 1973 for the offense of forgery; that he pleaded guilty to grand larceny in Marshall County on May 21, 1973, and was sentenced to two years, six months and 12 days; that he was convicted in 1974 for possession of stolen property; that he was convicted in Birmingham in 1977 for robbery, and that he was convicted in Birmingham in 1977 for violating the Uniform Controlled Substances Act. He was asked about other felony convictions and he replied that he “didn’t know” or “didn’t remember”. He further testified that he did not remember the date of his Montgomery escape conviction.
To most of the questions posed to appellant concerning his criminal record, counsel *1348 objected after the questions were answered. The objections were, nevertheless, sustained by the trial court. In this state of the record appellant has no cause to complain. Conley v. State, Ala.Cr.App., 354 So.2d 1172.
Counsel for appellant raised a number of objections to the prosecutor’s closing argument. Appellant’s counsel did not preserve for the record the comments he claimed were improper. In Huffman v. State, Ala.Cr.App., 360 So.2d 1038; judgment affirmed, Ala., 360 So.2d 1045, this court stated:
“The record must disclose with reasonable certainty what was said by the prosecutor in order for this court to attempt an informed review of the challenged comments.”
The record reflects that the trial court sustained appellant’s objections to the prosecutor’s comments and admonished the jury to disregard them. At one point the court polled the jury.
From the record:
“The Court: Ladies and gentlemen of the jury, that argument is entirely improper, and it’s not based on any evidence in this case. It appeals to prejudice and emotion and should be entirely disregarded by you. Do we have any member of the jury who cannot disregard that statement? (no response)”
This action by the court cured any possible error made by the prosecutor in his closing argument. As we have pointed out the record does not reflect, in any wise, the comments, verbiage, or statements employed by the prosecutor in his argument to the jury. Since the record is silent as to the comments complained about we cannot speculate as to what was actually said.
In Beckley v. State, Ala.Cr.App., 335 So.2d 244, this court said:
“Statements made by the prosecutor in argument to the jury must be viewed as in the heat of debate, and such statements are usually valued by the jury at their true worth and are not expected to become factors in the formation of a verdict.”
We have carefully examined the record for errors injuriously affecting the substantial rights of the appellant and have found none. The judgment of conviction is affirmed.
AFFIRMED.
All the Judges concur.